# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# Richmond Division

| | | |
|---|---|---|
| **KARA WILLIAMS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. ____3:23cv114_____ |
| | ) | |
| | ) | |
| **CITY OF RICHMOND SCHOOL** | ) | |
| **BOARD d/b/a RICHMOND PUBLIC** | ) | |
| **SCHOOLS,** | ) | |
| | ) | |
| Serve: Stephani Rizzi, Chair | ) | |
| City of Richmond School Board | ) | **JURY TRIAL DEMANDED** |
| 301 North Ninth Street | ) | |
| Richmond, Virginia 23219 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Kara Williams ("Ms. Williams" or "Plaintiff"), by counsel, as her Complaint against the City of Richmond School Board d/b/a Richmond Public Schools ("RPS" or "Defendant"), alleges as follows:

## NATURE OF ACTION

1. This is a civil action for damages and equitable relief based upon RPS's violations of Ms. Williams's rights under the False Claims Act's ("FCA") anti-retaliation provision, 31 U.S.C. § 3730(h).

2. Ms. Williams was employed by RPS as its Manager of its Early Head Start/Head Start Program ("Head Start Program"). RPS's Head Start Program receives federal funding from the United States Department of Health and Human Services ("HHS") to provide early childhood education services in accordance with federally-promulgated laws and regulations.

3. As described below, after Ms. Williams repeatedly discovered, investigated, and opposed RPS's violations of the applicable law and regulations with respect to the Head Start Program, and complained at various levels within RPS and to HHS, RPS retaliated against Ms. Williams, in violation of the FCA, by terminating her employment.

## PARTIES

4. Ms. Williams is a citizen of the United States and a resident of North Chesterfield, Virginia. At all times relevant to this Complaint, Ms. Williams was employed by RPS.

5. RPS operates, controls, and is otherwise legally responsible for the Richmond Public School System. It is a corporate entity with the ability to be sued under Virginia law.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this matter as it asserts a claim pursuant to the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

6. Venue is proper in the Eastern District of Virginia because a substantial part of the events giving rise to this action occurred in this judicial district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

7. RPS hired Ms. Williams in June 2014 to serve as the Manager of its Head Start Program.

8. Prior to joining RPS, Ms. Williams worked for various Head Start programs for over nineteen (19) years.

9. The Head Start Program is a national, federally-funded school readiness and child development initiative, which provides a variety of services to promote the academic, social, and emotional development of children for income-eligible families.

10. The Head Start Program is governed by federally-promulgated laws and regulations – including, but not limited to, the Head Start Act of 2007, the Head Start Program Performance Standards ("Head Start Performance Standards"), and fiscal regulations governing the administration of grants.

11. In her role as Manager of the Head Start Program, Ms. Williams was responsible for administering Head Start policies, regulations, and standards to ensure compliance and high standards of quality, both internally at RPS and through public and private sector partnerships.

12. Ms. Williams worked collaboratively with the Virginia Department of Education – Early Childhood to ensure the coordination, development, and implementation of data monitoring systems to measure the Head Start Program's effectiveness.

13. Ms. Williams planned, implemented, and evaluated each service area of the Head Start Program, including, but not limited to, early childhood development, health services, and mental health/disabilities services, to improve each service area's effectiveness and accountability.

14. Ms. Williams prepared annual renewals of grant proposals for grant expansions, improvement, or innovation, which incorporated Head Start Program participants and the staff, and developed and endorsed a funding application for every grant year.

15. Ms. Williams led strategic planning meetings to focus on innovative program improvements, including a complete Community Assessment every five (5) years.

16. Ms. Williams also prepared, submitted, and reported progress reports to Kristi D'Souza, Director of Early Childhood Education and School Readiness, in addition to others.

17. Ms. Williams also provided all necessary forms, reports, and evaluations for the National Office of Head Start, Regional Office of Head Start, and other offices as appropriate.

18. Tamara Mattier was the Regional Program Specialist with HHS assigned to provide oversight of the Head Start Program grant.

19. On an annual basis, Ms. Williams prepared budgets for the Regional Head Start Office and provide responses to the Office of Head Start regarding the adherence to the Head Start Performance Standards, to include grant administration.

20. At all times relevant to this Complaint, Ms. Williams primarily performed her duties for RPS through the Head Start Program's office in Richmond, Virginia.

21. In October of 2019, RPS hired Kristi D'Souza as its Director of Early Childhood Education and School Readiness. At all times relevant to this Complaint, Ms. D'Souza was Ms. Williams's direct supervisor. Also in Ms. Williams's supervisory chain was Dr. Tracy Epp, Chief Academic Officer for RPS.

22. In October of 2019, Dr. Epp and Ms. D'Souza proposed a merger of the Head Start Program and the Virginia Preschool Initiative.

23. Beginning in November of 2019, Ms. Williams began publicly and privately opposing the proposal to merge these programs during phone calls and email communications with Dr. Epp and Ms. D'Souza, in part because of concerns that the action, as proposed, would violate the terms of the Head Start Program's grant.

24. Following Ms. D'Souza's hire, she began making changes to the approved Head Start Program's organizational structure, which included removing oversight from Ms. Williams over Head Start teachers, and instructing RPS principals, who had not been trained on Head Start protocol. This was a violation of Head Start Policy 1302.101(a)(2), which states that programs must implement an effective management system that provides regular and ongoing supervision

to support individual staff professional development and continuous program quality improvement.

25. In addition, Ms. D'Souza authorized Head Start classroom changes without consultation from Ms. Williams, which ultimately did not comply with the health and safety requirements of Head Start programs. This was a violation of Head Start Performance Standards 1302.102(b)(1).

26. Ms. Williams complained about both of these issues to Ms. D'Souza and Dr. Epp.

27. In or around November of 2019, a Head Start student was unaccounted for at dismissal time because the child was placed on a school bus. After the child was found, Ms. Williams was notified days later, because the teacher was told not to communicate with Ms. Williams directly. This action resulted in Ms. Williams's inability to timely notify the Regional Head Start office of the event, which was a violation of Head Start Performance Standards 1302.102(d)(ii). Ms. Williams discussed this with Ms. D'Souza.

28. In November 2019, Ms. D'Souza requested that Chandra Rozier, Administrative Office Assistant for the Head Start Program, provide direct administrative support to duties that were outside of permissible uses for Head Start funds.

29. Based on Ms. Williams's understanding of the Head Start Performance Standards § 1302.101, she requested a meeting with Ms. D'Souza to discuss the roles for employees who are paid through the Head Start grant.

30. During that meeting on November 20, 2019, Ms. Williams provided Ms. D'Souza with a copy of the Head Start Performance Standards. Ms. Williams expressed her concern that Ms. D'Souza's directive with respect to the use of staff paid through the grant violated Head Start Performance Standards.

31.     Ms. D'Souza dismissed Ms. Williams's concern offhand, and stated that as she was the Director of Preschool, she had the authority to assign tasks to whomever she wanted, including Head Start staff.

32.     Immediately following this meeting, Ms. D'Souza sent an email to all staff, including Ms. Williams. In this email, Ms. D'Souza made remarks that Ms. Williams believed to be disrespectful and racially insensitive.

33.     Ms. Williams brought these concerns to Dr. Epp via email to seek assistance.

34.     After reviewing the communication, Dr. Epp agreed that the tone was insensitive and asked that the team "reset."

35.     Despite the understanding that the team would regroup and move forward with greater respect for each other and the greater role each position played within RPS, Ms. D'Souza began repeatedly excluding Ms. Williams from meetings and decisions that directly related to her role as the Head Start Manager. For example, there were numerous incidents involving Head Start children that were not reported to Ms. Williams, and changes made to Head Start teaching staff without informing or consulting Ms. Williams.

36.     Ms. D'Souza removed Ms. Williams from planning sessions regarding teacher development, despite decisions being made that directly impacted Ms. Williams's reportees. This was a violation under Head Start Performance Standards 1302.101 - Management Systems. More specifically, the standard required that at the beginning of each program year, and on an ongoing basis throughout the year, a program must design and implement program-wide coordinated approaches that ensure the training and professional development system for its employees in order to effectively support the delivery and continuous improvement of high-quality services.

37. There were also issues with Head Start students' attendance that Ms. Williams was not notified about, which was another violation of Head Start Performance Standards. Per Performance Standard 1302.16 - Attendance, programs must implement strategies to promote attendance. Students were being allowed to attend at their leisure and/or being withdrawn from the program. The Head Start Manager was not notified in any of these instances. Ms. Williams brought this concern to Ms. D'Souza.

38. In December of 2019, during a one-on-one meeting between Ms. D'Souza and Ms. Williams, Ms. D'Souza stated that RPS could simply "manipulate" the funding codes for Head Start and Virginia Preschool Initiative until RPS reported its financial statements and budgets to the Department of Education for funding. Ms. Williams adamantly objected, as under the Head Start Performance Standards and the Head Start Act § 642(2)(iii), the RPS Policy Council was supposed to be consulted and approve all applications for funding and amendments to the budget.

39. Ms. Williams continued to express her concerns over Ms. D'Souza's manipulation of Head Start funding in accordance with the Head Start Performance Standards on numerous occasions following that meeting.

40. Given Ms. Williams's mounting concerns over the Head Start Program as discussed above, Ms. Williams sought a meeting with Ms. D'Souza and Dr. Epp on December 4, 2019 to discuss, in part, the division of tasks and various requirements of a Head Start program, her professional relationship with Ms. D'Souza, and the decisions Ms. D'Souza had made that negatively impacted the Head Start Program as described above. Despite persistent requests by Ms. Williams, the parties did not meet until February 3, 2020.

41. As Ms. Williams waited for the meeting with Dr. Epp and Ms. D'Souza to occur, in January of 2020, Ms. Williams went to Linda Owen, RPS School Board Chair, to discuss her

concerns regarding Ms. D'Souza. Specifically, Ms. Williams shared concerns over Ms. D'Souza's unwillingness to learn about the Head Start Performance Standards and other requirements, her dismissive attitude towards Ms. Williams in discussions over the Head Start Program, and Ms. D'Souza's comments regarding the manipulation of funding.

42.     On February 3, 2020, Ms. Williams, Ms. D'Souza, and Dr. Epp finally met. During this meeting, Ms. Williams discussed the differences between RPS positions and Head Start grant funded positions. Ms. Williams also addressed her concerns that, as the grant administrator for RPS's Head Start Program, she was responsible for how the grant was administered and for its compliance with the performance standards.

43.     In February of 2020, Ms. Williams communicated concerns to Ms. D'Souza in regards to the discipline of Head Start students. Specifically, Head Start students were being "suspended" without the Head Start Manager's knowledge or approval.

44.     Under Head Start Performance Standard 1302.17 - Suspension & Expulsion, suspension must be used as the last resort in extraordinary circumstances where there is a serious safety threat that cannot be reduced or eliminated by the provision of reasonable modifications. The Head Start Manager is supposed to be notified prior to a student who is enrolled in the Head Start program being sent home due to behavior issues.

45.     In April of 2020, one of the policies proposed by Ms. D'Souza that Ms. Williams repeatedly opposed was a directive for Head Start staff to conduct home visits and parent teacher conferences in the same visit; however, under Head Start Performance Standard 1302.34(b)(3)(7), home visits and parent teacher conferences are to be conducted in separate visits.

46.     When Ms. Williams informed Ms. D'Souza of the policy, Ms. D'Souza replied that Head Start was still going to combine the visits. Ms. D'Souza further stated to Ms. Williams that she needed to stop always telling her what RPS could and could not do.

47.     Another directive Ms. Williams opposed from Ms. D'Souza was the restructuring and assignment of duties from positions that were funded through Head Start grants, which is a violation of Head Start Performance Standard 1302.101. This violation was later addressed by the Regional Office in an email to Ms. Williams, which Ms. Williams shared with Ms. D'Souza.

48.     As discussions continued regarding the merger of the Head Start Program and the Virginia Preschool Initiative in the Spring of 2020, Ms. Williams regularly voiced her concerns regarding how Ms. D'Souza intended to merge the programs.

49.     In April of 2020, when the RPS Policy Council met to discuss the merger of the Head Start Program and the Virginia Preschool Initiative, it decided that the proposed merger was not in the best interest of the Head Start Program and would only decrease the quality of services currently offered to Head Start families. The RPS Policy Council unanimously denied Dr. Epp's and Ms. D'Souza's request to merge the two programs.

50.     While Ms. Williams was not on the RPS Policy Council that made the decision not to merge the programs, both Dr. Epp and Ms. D'Souza blamed Ms. Williams for the proposal not being approved.

51.     On February 11, 2020, Ms. Williams met with Jason Kamras, Superintendent of RPS, to discuss her concerns.

52.     In March of 2020, when the Head Start grant was up for renewal, Ms. D'Souza and Dr. Epp revisited the topic of merging the Head Start Program and the Virginia Preschool Initiative.

53.     Ms. Williams reminded them that the Head Start Regional Specialist, Ms. Mattier, and Policy Council needed to be a part of the conversation if they wanted to merge the programs.

54.     Similar to the 2019 proposal to merge the programs, RPS's Policy Council voted against the merger because it would not benefit the Head Start Program and would only decrease the quality of services currently being offered to Head Start families.

55.     Upon information and belief, Ms. D'Souza blamed Ms. Williams for the RPS Policy Council's vote against the merger.

56.     Additionally, during the 2019-2020 Academic Year, Ms. D'Souza took the following actions in contravention of the Head Start Performance Standards and other requirements, to the detriment of Ms. Williams:

    a.     Ms. D'Souza invited non-Head Start staff members into the Policy Council despite the by-laws prohibiting such actions.

    b.     Ms. D'Souza also interfered in Ms. Williams's ability to communicate with the Regional Head Start office which is a condition of the Head Start grant.

    c.     Ms. D'Souza's interference not only impeded Ms. Williams's ability to perform her job, but also created a façade of insubordination through written reprimands.

    d.     Ms. D'Souza also restricted the collaborative communication that was necessary between the Head Start Child Development team and RPS preschool teachers.

    e.     Lastly, Ms. D'Souza interfered with Head Start Performance Standards by refusing to allow Ms. Williams to provide the necessary supplies and materials to be sent to Head Start families for virtual school.

57. Following Ms. Williams's repeated opposition to directives that violated the Head Start Performance Standards and the Head Start Act, Ms. D'Souza's attitude and demeanor towards Ms. Williams significantly changed and a targeted effort to have Ms. Williams removed was initiated.

58. As the primary liaison to the Regional Head Start Office, Ms. Williams repeatedly advised RPS that it needed to make sure that it adhered to the Head Start Performance Standards to ensure that it maintained the grant and so that, as the Manager of the Head Start Program, she would not be held responsible for violating the regulations.

59. Under 45 C.F.R. § 1301.1, the U.S. Department of Health and Human Services requires that grantees who receive funds from the Head Start program are required to "observe standards of organization, management, and administration that will ensure, so far as reasonably possible, that all program activities are conducted in a manner consistent with the purposes of the Act and the objective of providing assistance effectively, efficiently, and free of any taint partisan political bias or personal or family favoritism."

60. On June 4, 2020, Ms. Williams received her first written reprimand from Ms. D'Souza for "incidents of serious concern," which allegedly occurred on April 23, 2020 and May 19, 2020.

61. In the written reprimand, Ms. D'Souza alleged that on April 23, 2020, Ms. Williams refused to support and complete necessary steps for the purchase of instructional supplies for preschool students in response to the COVID-19 pandemic. Further, Ms. D'Souza alleged that Ms. Williams engaged in a "combative" dialogue and threatened to flag the purchase in the internal accounting.

62. Ms. D'Souza's account of this event portrayed Ms. Williams in a significantly negative light and mischaracterized her opposition to this purchase.

63. To the contrary, Ms. Williams did not oppose the purchase of the material because she "disapproved" of the request Ms. D'Souza was proposing. The request by Ms. D'Souza to purchase materials with Head Start funds and issue the materials to students who do not qualify for Head Start was a blatant violation of the Head Start Performance Standards.

64. As to the alleged event in the written reprimand on May 19, 2020, Ms. D'Souza alleged that Ms. Williams was insubordinate when she failed to provide a draft of the Head Start proposal to her prior to submitting the proposal to the Regional Head Start Office.

65. To the contrary, Ms. Williams provided to Ms. D'Souza a draft of the proposal and the deadline for submission on two separate occasions.

66. On June 4, 2020, Ms. Williams initiated the RPS grievance process based on the written reprimand from Ms. D'Souza.

67. One of the many services the Head Start Program provides to its students is health screenings. In or around July of 2020, Ms. D'Souza informed Ms. Williams and the Head Start Program staff that moving forward, RPS's Certified Nursing Assistants ("CNA") would be performing the health screenings.

68. Pursuant to Head Start Performance Standard 1302.91(8), all health procedures are to be performed by a licensed or certified health professional. In addition, under Head Start Performance Standard 1302.42(b)(2), all vision and hearing screenings must be conducted within forty-five (45) calendar days of the child attending the Head Start Program. Lastly, a follow-up assessment must be done with any child who does not pass those screenings pursuant to Head Start Performance Standard 1304.42(d)(1-2).

69. In response to Ms. D'Souza's proposal, Ms. Williams expressed her concern that the RPS CNAs were not currently trained on the Head Start Performance Standards and that this failure could cause the Head Start Program to be out of compliance.

70. On July 20, 2020, Ms. Williams sent another email to Ms. D'Souza articulating her concerns over the Head Start organizational chart and Ms. D'Souza implementing changes that would negatively affect the Head Start Program and deviate from the federal guidelines proscribed in the Head Start Performance Standards.

71. On July 30, 2020, Ms. D'Souza issued a second reprimand to Ms. Williams, alleging that Ms. Williams failed to "positively and proactively contribute to the Early Childhood Department."

72. Ms. D'Souza also alleged in the second reprimand that Ms. Williams failed to bring certain concerns to Ms. D'Souza first, instead directing them to the Regional Head Start Office.

73. In a subsequent email on August 27, 2020, Ms. Williams communicated to Ms. D'Souza that she could not adhere to any directive that was in violation of the Head Start Performance Standards.

74. Thereafter, Ms. Williams provided RPS with a written response to the factually inaccurate statements made in Ms. D'Souza's July 30, 2020 written reprimand.

75. Ms. Williams informed RPS that she believed Ms. D'Souza was issuing these reprimands in retaliation for Ms. Williams voicing her concerns regarding decisions that violated Head Start Performance Standards and liability policies.

76. On September 15, 2020, Ms. Mattier wrote an email to several RPS administrators, including Ms. D'Souza, regarding the expectations of a Head Start program and requirement of

direct supervision and management of Head Start employees pursuant to §1302.1 of the Head Start Performance Standards.

77. On September 18, 2020, Ms. D'Souza issued a third reprimand to Ms. Williams for "continued performance and professionalism concerns."

78. The basis for this reprimand was not factually accurate and Ms. Williams's actions did not violate RPS's policy on insubordination.

79. This reprimand carried a three (3) day suspension without pay for Ms. Williams.

80. Ms. Williams filed an administrative grievance with RPS pursuant to the Department of Human Resource Management ("DHRM") policy.

81. On September 24, 2020, following a conversation with Ms. D'Souza instructing Ms. Williams to prohibit her staff from sending direct communication to Head Start teachers without including the school principals, Ms. Williams reiterated to Ms. D'Souza that they needed to meet with Regional Head Start, Mr. Kamras, and Dr. Epp to review the Head Start Program guidelines.

82. In or around October of 2020, Ms. D'Souza hired Virginia Preschool Initiative Instructional Assistants to work in a Head Start classroom without approval from the Policy Council, which is a requirement under the Head Start Act § 642(2)(D)(vi). Ms. D'Souza also did not provide documentation that the Instructional Assistants met the Child Development Associate requirements mandated by Head Start Performance Standards 1302.91(e)(3).

83. After Ms. Williams learned of the hiring, Ms. Williams articulated the requirements of the Head Start Performance Standards to Ms. D'Souza in October of 2020. Ms. D'Souza never responded to the email.

84. On October 22, 2020, Ashley Parks, Director of Employee Relations, notified Ms. Williams that she was not entitled to participate in the DHRM grievance process and that the grievance was being closed.

85. Six days later, Ms. Williams was notified through counsel that RPS was allowing her to appeal her suspension before Mr. Harry Hughes, Chief of Schools of RPS, in November 2020.

86. Ms. Williams served the proposed three (3) day suspension from December 15, 2020 to December 17, 2020.

87. In early January 2021, Ms. Williams received a letter of dismissal after returning from her three (3) day suspension.

88. RPS, at the insistence of Ms. D'Souza, terminated Ms. Williams's employment in retaliation for her continued, good faith reports that the RPS Early Childhood Education and Head Start Programs were not in compliance with the Head Start Program Performance Standards.

89. Up until the written reprimands and termination from employment set forth above, Ms. Williams had never been disciplined for any alleged performance or behavioral issues – verbal or written.

## COUNT I

### Retaliation in Violation of the False Claims Act

90. The allegations in the foregoing paragraphs are incorporated as if realleged fully herein.

91. 31 U.S.C. § 3730(h) prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against the terms or

15

conditions of employment because of lawful acts done by the employee in furtherance of an action under the False Claims Act.

92. As described above, RPS terminated Ms. Williams's employment in retaliation for investigating, reporting, and opposing repeated violations of the Head Start Act and Head Start Performance Standards to her supervisors and to the federal program providing the funds.

93. Ms. Williams's investigation, report, and opposition related to conduct that did, or reasonably could have led, to a viable FCA action.

94. As a result of RPS's actions, Ms. Williams has suffered, and continues to suffer, economic loss, for which she is entitled to reinstatement with the same seniority Ms. Williams would have had but for the discrimination, double back pay, interest on backpay, and compensation for any special damages sustained, including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kara Williams requests the following relief:

A. Entry of judgment in favor of Ms. Williams on Count I;

B. Reinstatement with the same seniority status to her position at RPS;

C. An award for double the amount of back pay owed, as well as interest on back pay;

D. Special damages;

E. Plaintiff's attorney's fees and costs of this action; and

F. Any and other such further relief that this Court deems appropriate.

## JURY DEMAND

A TRIAL BY JURY IS DEMANDED.

                Respectfully submitted,

                KARA WILLIAMS

By:        /s/
                Ashley R. Passero (VSB No. 90462)
                Barbara Queen (VSB No. 47314)
                LawrenceQueen
                701 E. Franklin Street, Suite 700
                Richmond, VA 23219
                Telephone: (804) 643-9343
                Facsimile: (804) 643-9368
                *apassero@lawrencequeen.com*
                *bqueen@lawrencequeen.com*

                *Counsel for Plaintiff Kara Williams*