IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| KARA WILLIAMS, )<br>    Plaintiff, )<br>       v. )<br>)<br>CITY OF RICHMOND SCHOOL BOARD )<br>D/B/A RICHMOND PUBLIC SCHOOLS, )<br>    Defendant. )<br>)| Civil Action No. 3:23-CV-114 (RCY) |

**MEMORANDUM OPINION**

This is an employment dispute arising from the termination of Plaintiff Kara Williams's ("Ms. Williams" or "Plaintiff") employment by Defendant City of Richmond School Board, D/B/A Richmond Public Schools ("RPS" or "Defendant"). The matter is before the Court on Defendant City of Richmond School Board's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, ECF No. 7. The motion has been briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated herein, the Court will deny Defendant's Motion to Dismiss.

**I. PROCEDURAL HISTORY**

Plaintiff filed her Complaint, ECF No. 1, on February 13, 2023. On April 17, 2023, Defendant filed the instant Motion to Dismiss, ECF No. 7, along with its Brief in Support ("Def.'s Br. Supp."), ECF No. 8. Plaintiff filed a Memorandum in Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp'n.") on May 1, 2023, ECF No. 10. On May 8, 2023, Defendant filed its Reply in Support of its Motion to Dismiss ("Reply"), ECF No. 11. On May 16, 2023, the Court issued

an Order staying discovery and canceling the Initial Pretrial Conference while it considered Defendant's Motion to Dismiss.  ECF No. 14.

## II. FACTUAL BACKGROUND[1]

RPS hired Ms. Williams to be the Manager of its Head Start Program in June of 2014. Compl. ¶ 7, ECF No. 1.  Ms. Williams was previously employed in other positions related to Head Start Programs for nineteen years.  *Id*. ¶ 8.  In her role with RPS, Ms. Williams was responsible for administering Head Start Program policies, regulations, and standards within RPS, and she coordinated with the Virginia Department of Education and national and regional Head Start offices.  *Id*. ¶¶ 11, 17.

In October of 2019, RPS hired Kristi D'Souza to be its Director of Early Childhood Education and School Readiness.  *Id*. ¶ 21.  Ms. D'Souza was Ms. Williams's direct supervisor. *Id*.  Shortly thereafter, Dr. Tracy Epp, RPS's Chief Academic Officer and another part of Ms. Williams' "supervisory chain," and Ms. D'Souza proposed a merger of the Head Start Program and the Virginia Preschool Initiative.  *Id*. ¶¶ 21–22.  Ms. Williams opposed the merger as she believed such a merger would violate the terms of the Head Start Program's grant.  *Id*. ¶ 23.  Ms. D'Souza made changes to the Head Start Program's organizational structure, authorized Head Start classroom changes, and directed Head Start employees to complete work outside their approved duties, all of which allegedly violated Head Start Policies 1302.101(a)(2) and 1302.102(b)(1).  *Id*. ¶¶ 24–25, 28.  Ms. Williams discussed these issues with Ms. D'Souza and Dr. Epp in the fall of 2019, but her concerns were dismissed.  *Id*. ¶¶ 26, 30–31.

---

[1] When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff."  *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

In the fall of 2019, Ms. D'Souza did not include Ms. Williams in communications with Head Start teachers and other conversations that related to the administration of the Head Start Program. *Id.* ¶¶ 35–36. In December of 2019, Ms. D'Souza stated that RPS could manipulate the funding codes for the Head Start Program, and Ms. Williams expressed concerns that this would violate Section 642(2)(iii) of the Head Start Act and RPS Policy Council procedures. *Id.* ¶ 38. Ms. Williams attempted to address these concerns by scheduling a meeting with Dr. Epp and Ms. D'Souza, but this meeting was delayed throughout the winter of 2019. *Id.* ¶¶ 40–41. While waiting for this meeting, Ms. Williams reported her concerns to Linda Owen, RPS School Board Chair. *Id.* ¶ 41. Additional alleged violations of the Head Start Program's policies occurred throughout the spring of 2020, and Ms. Williams repeatedly expressed concerns to Ms. D'Souza throughout this period. *Id.* ¶¶ 44–48.

The RPS Policy Council met in April of 2020 to discuss the merger of the Head Start Program and the Virginia Preschool Initiative but ultimately decided that a merger was not in the best interest of the Head Start Program or its students. *Id.* ¶ 49. Dr. Epp and Ms. D'Souza blamed Ms. Williams for the RPS Policy Council's denial of the merger. *Id.* ¶ 50. Ms. Williams's relationship with Ms. D'Souza continued to deteriorate throughout the spring of 2020, and Ms. Williams received her first written reprimand from Ms. D'Souza on June 4, 2020, which Ms. Williams contends portrayed her in an unfair light and mischaracterized her positions. *Id.* ¶¶ 60–62. Ms. Williams initiated the RPS grievance process immediately following the first reprimand. *Id.* ¶ 66. Beginning in July of 2020, Ms. D'Souza made additional changes to the Head Start Program, specifically involving medical screening procedures that allegedly violated Head Start Performance Standard 1302.42(b)(2), over Ms. Williams' objections. *Id.* ¶¶ 68–69.

On July 20, 2020, Ms. Williams received a second written reprimand from Ms. D'Souza regarding Ms. Williams's failure to positively contribute to the Early Childhood Department, the department that encompassed the Head Start Program, and over her taking concerns to the Regional Head Start Office instead of taking concerns to Ms. D'Souza. *Id*. ¶¶ 71–72. Ms. Williams informed RPS that she believed Ms. D'Souza issued these reprimands in retaliation for Ms. Williams voicing concerns regarding violations related to the Head Start Program. *Id*. ¶ 75. On September 18, 2020, Ms. Williams received a third written reprimand from Ms. D'Souza for on-going performance and professionalism concerns. *Id*. ¶ 77. Ms. Williams claimed the reprimand was not factually accurate and filed a grievance with RPS. *Id*. ¶¶ 78–79.

Throughout the fall of 2022, Ms. D'Souza made additional decisions and changes to the Head Start Program, and Ms. Williams again expressed concerns regarding potential violations to program policy and grant mandates. *Id*. ¶¶ 81–83. On October 22, 2020, Ms. Williams was notified that she was not entitled to participate in the RPS grievance process and that her grievance was closed. *Id*. ¶ 84. After Ms. Williams served a three-day suspension in December of 2022, RPS notified Ms. Williams that it terminated her employment. *Id*. ¶¶ 86–88.

Ms. Williams alleges RPS terminated her employment in retaliation for investigating, reporting, and opposing repeated violations of the Head Start Act and Head Start Performance Standards. *Id*. ¶ 92. Ms. Williams alleges that her investigation could have reasonably led to a viable False Claim Act action. *Id*. ¶ 93.

### III. LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect. *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id*. (citations omitted). "[A] motion to dismiss for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Id*. (citations omitted); *see also Martin*, 980 F.2d at 952.

However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Labels and conclusions," a "formulaic

recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

## IV. DISCUSSION

The Court will begin by addressing whether it should consider the six documents included by Defendant RPS in its Brief in Support of its Motion to Dismiss, ECF No. 8, in resolving the instant Motion. After that, the Court will turn to the substance of RPS's Motion to Dismiss.

### A. Inclusion and Consideration of Additional Documents

Defendant RPS attached six documents to its brief supporting its Motion. *See* Def.'s Br. Supp. Exs. 1–6, ECF Nos. 8-1–8-6. The attached documents are:

>Exhibit 1: Email from Plaintiff to Dr. Epp, dated November 21, 2019;
>Exhibit 2: Written reprimand issued to Plaintiff from Ms. D'Souza, dated June 4, 2020;
>Exhibit 3: Statement of grievance from Plaintiff, dated July 20, 2020;
>Exhibit 4: Written reprimand issued to Plaintiff from Ms. D'Souza, dated July 30, 2020;
>Exhibit 5: Email from Plaintiff to Ms. D'Souza, dated July 20, 2020; and
>Exhibit 6: Written reprimand issued to Plaintiff from Ms. D'Souza, dated September 18, 2020.

When deciding a motion to dismiss, Courts are "generally limited to a review of the allegations of the complaint itself." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). However, without converting the motion to dismiss to a motion for summary judgment, Courts may permissibly consider: (1) documents that are explicitly incorporated into the complaint; (2) documents that the plaintiff attaches as exhibits to the complaint; and (3) documents that are "integral to the complaint" with undisputed authenticity. *See id.* at 166.

Although Plaintiff referenced these documents throughout the Complaint, Plaintiff did not incorporate or attach them, *see generally* Compl., ECF No. 1, so the Court may only consider these

documents if they are "integral" to the Complaint. *Goines*, 822 F.3d at 166. Documents are not necessarily "integral to the complaint" even when the complaint expressly references or quotes those documents. *See id.* Rather, documents are considered "integral to the complaint" if the plaintiff's claims "turn on, []or are . . . otherwise based on, statements contained in the [documents]." *Id.*

Defendant argues that the Court can and should consider the six exhibits at this stage because Plaintiff's Complaint is based on or relies on the content within the documents. *See* Reply 6–7, ECF No. 11. Plaintiff Williams argues that the Court should not consider these documents now because she does not rely on the content within the documents. *See* Pl's Opp'n 11–14, ECF No. 10. The Court will address each document in turn.

Exhibit 1 is an email from Ms. D'Souza that Plaintiff forwarded to Dr. Epp. ECF No. 8-1. Plaintiff expressed concerns regarding comments made by Ms. D'Souza and requested a time to meet with Dr. Epp. Although Plaintiff mentioned this email in the Complaint, it is not integral to Plaintiff's Complaint because her False Claims Act anti-retaliation claim "do[es] not turn on, nor [is it] otherwise based on" the information within this email, *Goines*, 822 F.3d at 166, because the email does not mention any protected activity, fraud, or investigation. *See generally* discussion *infra* Part IV.B.

Exhibit 2 is the first written reprimand issued from Ms. D'Souza to Plaintiff. ECF No. 8-2. Plaintiff referenced this reprimand in the Complaint, but Plaintiff only did so to say that she believed that RPS was making a paper trail of reprimands to justify terminating Plaintiff's employment; Plaintiff places no reliance on the *content* within the written reprimand as part of her False Claims Act anti-retaliation claim. Thus, Plaintiff's claim does not turn on, nor is it based on, the reprimand.

Exhibit 3 is Plaintiff's statement of grievance filed with RPS. ECF No. 8-3. The Court finds that this document is "integral" to the Complaint because it is a manifestation of Plaintiff's allegation that RPS was taking retaliatory action against her as she was opposing, investigating, and attempting to stop potential False Claims Act violations regarding the Head Start Program. The content within the statement of grievance exhibit is precisely an activity that Plaintiff relies on in her anti-retaliation claim. Thus, the Court finds Plaintiff's claim is based on the statement of grievance, and the Court may consider it here.

Exhibit 4 is the second written reprimand issued from Ms. D'Souza to Plaintiff. ECF No. 8-4. For similar reasons to Exhibit 2, this reprimand is not "integral" to the Complaint.

Exhibit 5 is an email from Plaintiff to Ms. D'Souza in which Plaintiff identifies several areas of disagreement and concern regarding changes made to the Head Start Program. ECF No. 8-5. The Court finds that this email is "integral" to the Complaint because Plaintiff voiced concerns to her direct supervisor regarding potential violations of the Head Start Program Act, and that is what the Complaint hinges on: steps Plaintiff took to address, investigate, and stop potential False Claims Act violations, the employer's awareness of these measures, and any adverse action taken against Plaintiff as a result. *See* discussion *infra* Part IV.B. Accordingly, this email may properly be considered at this stage.

Exhibit 6 is the third and final written reprimand issued from Ms. D'Souza to Plaintiff, ECF No. 8-6, and for similar reasons to Exhibits 2 and 4, it is not integral to the Complaint.

In sum, the Court declines to consider Exhibits 1, 2, 4, and 6 in ruling on Defendant's Motion to Dismiss. These documents are best understood as potential defenses or rebuttal to Plaintiff's claims, but they are not essential to determining the sufficiency of the Complaint.

Although these documents will undoubtedly play a role during subsequent motions and discovery, they are inappropriate in the context of this Motion.

Plaintiff's statement of grievance and email to Ms. D'Souza (Exhibits 3 and 5), on the other hand, are "integral" to the Complaint: the steps Plaintiff took to address the written reprimands and report on-going Head Start Program violations are, in part, what the Complaint is based on. Plaintiff alleges that her employment was terminated because of her good-faith efforts to report Head Start Program violations to RPS and Head Start personnel, and Plaintiff's written grievance and email to her supervisor are manifestations of such reports. Plaintiff referenced these exhibits in the Complaint specifically, but she also referenced efforts to report alleged violations to RPS and Head Start personnel generally. Additionally, Plaintiff does not dispute the authenticity of these two exhibits. *See* Reply 6 n.1; *see generally* Pl's Opp'n 11–14. Therefore, the Court will consider Plaintiff's statement of grievance and email to Ms. D'Souza in the following analysis.

## B. False Claims Act Retaliation Claim

The Complaint alleges that Defendant terminated Plaintiff's employment in violation of the anti-retaliation provision, Section 3730(h), of the False Claims Act ("FCA") after Plaintiff "investigat[ed], report[ed], and oppos[ed]" Defendant's actions that allegedly could have led to a viable FCA claim under 31 U.S.C. §§ 3729–33. *See* Compl. ¶ 92.

Congress amended the FCA in 1986 to include an anti-retaliation provision that protects whistleblowers' efforts to discourage fraud against the federal government. *Glynn v. EDO Corp.*, 710 F.3d 209, 213–14 (4th Cir. 2013). "To plead retaliation under Section 3730(h), a plaintiff must allege that (1) [s]he engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against h[er] as a result." *Smith v. Clark/Smoot/Russell*,

796 F.3d 424, 433 (4th Cir. 2015). Retaliation allegations need only pass "Rule 8(a)'s relatively low notice-pleadings muster—in contrast to Rule 9(b)'s specificity requirements." *Id.*

Defendant argues that Plaintiff has failed to state a claim because Plaintiff has not plausibly alleged the first and third elements of her FCA retaliation cause of action. *See* Def.'s Br. Supp. 10–15; Reply 2–8. Plaintiff disagrees. *See generally* Pl.'s Opp'n. And so does the Court.

Specifically, the Court finds that the facts Plaintiff alleges in her Complaint are "enough to raise a right to relief above the speculative level[,]" *Twombly*, 550 U.S. at 555, and she has therefore stated an FCA retaliation claim.

1. Protected Activity

The first issue is whether Plaintiff sufficiently alleged that she engaged in FCA-protected activity. To demonstrate engagement in a protected activity, a plaintiff-employee must plead "that they acted 'in furtherance of an action under' the False Claims Act or undertook 'other efforts to stop 1 or more violations' of the False Claims Act." *Young v. CHS Middle E., LLC*, 611 F. App'x 130, 132 (4th Cir. 2015) (quoting 31 U.S.C. § 3730(h)). A plaintiff-employee must satisfy differing legal standards depending on within which of these two categories a plaintiff-employee's alleged conduct fits.

If a plaintiff-employee is alleging that they acted "in furtherance of an action under" the FCA, "including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under" the FCA, *United States ex rel. Grant v. United Airlines, Inc.*, 912 F.3d 190, 200 (4th Cir. 2018), then the protected activity within this category must satisfy "distinct possibility" standard. *See, e.g.*, *Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). Under this standard, a plaintiff-employee has engaged in protected activity if "litigation is a distinct

possibility, when the conduct could reasonably lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Id.*

If, however, a plaintiff-employee is alleging that they engaged in "other efforts to stop [one] or more violations of the False Claims Act," 31 U.S.C. 3730(h), then the plaintiff-employee must satisfy the "objective reasonableness" standard. *Grant*, 912 F.3d at 201. "Under this standard, an act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate, the FCA." *Id.*

Defendant RPS argues that Plaintiff did not provide any information that would satisfy the distinct possibility standard, and that the allegations failed to meet the objective reasonableness standard because the Complaint did not allege a nexus to a specific FCA violation. *See* Def.'s Br. Supp. 10–11. Plaintiff contends that her Complaint sufficiently pleaded both categories of protected activities. *See* Pl.'s Opp'n 6.

The Court finds that Plaintiff has plausibly alleged she engaged in protected activity within the second category under the FCA. Taking the facts alleged in the Complaint as true, Plaintiff has sufficiently alleged that she believed her employer, RPS, "was violating the FCA, that this belief was reasonable, that [s]he took action based on that belief, and that h[er] actions were designed to stop one or more violations of the FCA." *Grant*, 912 F.3d at 201–02.

Taking the facts alleged as true, it was objectively reasonable for Plaintiff to believe that RPS was violating Head Start rules and standards. Plaintiff was aware that RPS requested to impermissibly use Head Start-funded employees to complete non-Head Start Program tasks. Compl. ¶ 28. Ms. D'Souza told Plaintiff that RPS could "manipulate" funding codes for the Head Start Program. *Id.* ¶ 38. And Plaintiff was aware that RPS requested to purchase materials with Head Start funds and issue the materials to non-Head Start-eligible students. *Id.* ¶ 63.

11

Additionally, the September 15, 2020, communication from Head Start Regional Specialist Ms. Mattier to RPS administrators regarding Head Start Program expectations and requirements pursuant to Section 1302.1 of the performance standards reinforces the objective reasonableness of Plaintiff's concerns that RPS was violating the standards. *See id.* ¶ 76.

Also, the Complaint "supports a reasonable inference that [Plaintiff]'s actions were designed to stop one or more violations of the FCA." *Grant*, 912 F.3d at 202. Plaintiff reported concerns numerous times to her direct supervisor, next level supervisor, and regional Head Start personnel regarding RPS's alleged violations of Head Start rules and standards. Specifically, Plaintiff repeatedly opposed and expressed concern about the various the alleged misuses of Head Start-funded employees. Compl. ¶¶ 29, 63. Plaintiff voiced opposition to RPS employees manipulating funding codes for the Head Start Program. *Id.* ¶¶ 38–39. Plaintiff voiced, investigated, and reported her concerns to RPS administrators and Head Start regional personnel. *Id.* ¶ 72.

In fact, Plaintiff's actions in this case are analogous to those taken in *United States ex rel. Grant v. United Airlines*, where the Fourth Circuit found that the plaintiff-employee engaged in a protected activity after he "complained on multiple occasions in person and in writing about United's pencil whipping and failure to use proper tools," and that "[t]hese complaints . . . alleged specific illegal, fraudulent conduct against the government." 912 F.3d at 202. Here, Plaintiff recounted how on multiple occasions, including in her written grievance and email to Ms. D'Souza, she reported concerns with alleged dishonest, illegal, and fraudulent conduct by RPS administrators relating to the Head Start Program and with how they inappropriately used Head Start funds and personnel; these concerns were all based on her understanding and experience administering the Head Start Program. Plaintiff's actions demonstrated an ongoing effort to

investigate and report these apparent violations and her objectively reasonable belief that her actions would stop these violations.

Based on the allegations in the Complaint viewed in the light most favorable to Plaintiff, the Court finds that Plaintiff has plausibly alleged that she engaged in FCA-protected activity because she had an objectively reasonable belief that Defendant RPS violated the FCA, and she acted to stop potential violations when she investigated, reported, and opposed these violations.

2. Causation

The remaining issue is whether Plaintiff has sufficiently pleaded the third element in her FCA anti-retaliation claim: causation. The causation analysis requires an examination of the timeline of events and whether the facts support a "reasonable inference" that the employer took adverse action against the employee because employee engaged in a protected activity. *Grant*, 912 F.3d at 203.

Defendant argues that the fourteen months between when Plaintiff initially voiced concerns and when RPS ultimately terminated her employment is insufficient to give rise to the inference that RPS terminated Ms. Williams' employment because of her objections to Head Start Program violations.[2] *See* Def.'s Br. Supp. 14–15; Reply 5–6. Defendant cites two Fourth Circuit cases for the proposition that a period of months or years is too long to demonstrate the requisite causal connection in an FCA retaliation case. Reply 5–6. Plaintiff argues that the timeline of events supports a causal connection between her engagement in a protected FCA activity and the adverse action taken by RPS against her. *See* Pl.'s Opp'n 9–10. Specifically, Plaintiff argues that she

---

[2] Defendant also argues that the written reprimands show that Plaintiff was terminated due to insubordination and not because of her protected activity. *See* Reply 6–8. However, the Court may not consider the contents of the written reprimands at this procedural posture. *See* discussion *supra* Part IV.A. Accordingly, the Court does not engage with this unripe branch of Defendant's argument.

initially voiced concerns related to the Head Start Program in November of 2019 and continued to voice concerns through January of 2021 when RPS terminated her employment. *Id.*

Accepting Plaintiff's alleged facts as true and viewing them in the light most favorable to her, the Court finds that Plaintiff has sufficiently pleaded the required causal link.

Fourteen months elapsed between when Plaintiff first voiced concerns regarding RPS's violations of the Head Start Program and when RPS terminated her employment. But during this time, Plaintiff engaged in ongoing opposition to and efforts to stop ongoing violations by Defendant RPS. *See, e.g.*, Compl. ¶ 39 ("Ms. Williams continued to express her concerns over Ms. D'Souza's manipulation of Head Start funding in accordance with the Head Start Performance Standards."). Along the way, Plaintiff voiced concerns of retaliation for her continuous opposition, such as in her statement of grievance, where Plaintiff alleged that RPS was making "an attempt to create a paper trail that would lead to [her] termination." *See generally* Def.'s Br. Supp. Ex. 3. Plaintiff stated a causal connection in the Complaint: "Following Ms. Williams' repeated opposition to directives that violated the Head Start Performance Standards and the Head Start Act . . . a targeted effort to have Ms. Williams removed was initiated." Compl. ¶ 57. This causal link is a reasonable inference to draw given that, among many other facts Plaintiff alleges, "Dr. Epp and Ms. D'Souza blamed Ms. Williams for the [merger] proposal not being approved" following Plaintiff Williams's "regular[] voic[ing] [of] her concerns" about the intended merger, and Plaintiff received her first written reprimand (the start of the "paper trail") from Ms. D'Souza at the beginning of the month (June 2020) immediately following the month of the merger's failure (April 2020). *Id.* ¶¶ 48–50, 60; *see also* Def.'s Br. Supp. Ex. 3.

Defendant cites to *United States ex rel. Complin v. N. Carolina Baptist Hosp.*, 818 F. App'x 179, 182 (4th Cir. 2020), and *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012), to argue

14

that fourteen months was too long for Plaintiff to sufficiently demonstrate the causal link between the protected activity and subsequent retaliation are. But neither case carries the day for Defendant at this stage.

In *Complin*, there was a gap of two years between protected activity and termination. *See* 818 F. App'x at 182. In that case, though, the plaintiff-employee engaged in protected activity while employed by one employer but was terminated by an entirely different employer. *Id.* The Fourth Circuit affirmed the district court's dismissal of the complaint with prejudice because it contained insufficient facts to causally link the new employer's adverse action to the old employer's awareness of the protected FCA activity. *Id.* at 185. Contrast that to the Complaint here, which does not allege some sort of collusion between RPS and an additional or future employer years later; rather, Plaintiff alleges RPS itself terminated her employment in retaliation for her ongoing protected activity.

In *Kappos*, the Fourth Circuit found that the plaintiff-employee failed to demonstrate a causal link between the employer's knowledge of their protected activity and their subsequent termination because, generally, "mere temporal proximity between the two events is insufficient to satisfy the causation element of the prima facie requirement." 489 F. App'x at 643 (internal quotation marks omitted). So, *Kappos* only supports the proposition that temporal progression and proximity are insufficient to show causation "*without more*." *Id.* (emphasis added). But "[w]here, as here, a plaintiff provides a plausible explanation for the timeline of h[er] complaints and h[er] termination, the Court must accept and construe in h[er] favor [that explanation] at this early stage of litigation." *Kamran v. Ali*, No. 120-cv-1494, 2021 WL 4453598, at *9 (E.D. Va. Sept. 29, 2021).

15

For these reasons, the Court finds that Plaintiff has plausibly alleged causation at the Rule 12(b)(6) stage, and thus has satisfied the pleading standard for the necessary elements of a retaliation claim under the FCA.

## V. CONCLUSION

The Court will not at this stage entertain arguments on the merits of the claims or of potential defenses, or examine evidence beyond that which is appropriate for a 12(b)(6) Motion to Dismiss. Through that lens, the Court finds Plaintiff's Complaint states a claim for relief that is plausible on its face, and therefore the Court will deny Defendant's 12(b)(6) Motion to Dismiss for Failure to State a Claim.

An appropriate Order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: October 26, 2023